UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MARY WASHNOCK,

Plaintiff,

v.

Case No. 12-11607
Honorable Julian Abele Cook, Jr.

BROOKDALE SENIOR LIVING, INC.,

Defendant.

# ORDER

On April 9, 2012, the Plaintiff, Mary Washnock - acting as the personal representative of the estate of Marian Washnock ("Washnock") - filed a negligence action against Brookdale Senior Living, Inc. ("Brookdale"), on the basis of diversity jurisdiction. 28 U.S.C. § 1332. In her complaint, the Plaintiff has alleged that Washnock died as a direct and proximate result of the negligence of Brookdale. In making this allegation, the Plaintiff proclaims that the Defendant failed to adequately monitor the senior living facility in which the decedent resided. Currently pending before the Court is (1) Brookdale's motion for summary judgment pursuant to Fed. R. Civ. P. 56(c), (2) Washnock's motion for leave to supplement her response to Brookdale's motion for summary judgment, and (3) Washnock's motion for leave to file an amended witness list. The Court will address each in turn.

## I.

The essence of this lawsuit is based on the relationship between the decedent, Marian Washnock, and Brookdale, a senior living facility which provided various levels of care and support

for elderly individuals. Washnock first moved to Brookdale's Grand Court Farmington Hills facility ("Grand Court") in September of 2005. Prior to that time, she lived independently in a condominium in Novi, Michigan. According to the Plaintiff, the decision to move to Grand Court was based, at least in part, on Washnock's deteriorating mental condition which was spurred by her progressing dementia, as well as the need for a housing arrangement that would be capable of providing assistance with her daily living activities. The Plaintiff maintains that a representative of Brookdale assured the family that the facility was accustomed to accommodating the elderly, and, in fact, acknowledged that a substantial number of the people who resided at Grand Court had some degree of cognitive impairment.[1] (Faff Dep. 44:13-18 Ex. 4 to Pl's Resp.).

At some time after 9:00pm on November 30, 2011, Washnock left her apartment unit alone, wearing only her pajamas. Thereafter, she exited the Grand Court facility unobserved through a back door in the common area of the building. The Plaintiff alleges that the door through which Washnock exited was self-locking and accessible only by a keycard (that Washnock was never issued), and unmonitored.[2] While attempting to regain entry to the building through the patio door of a neighbor, Washnock slipped and fell to the ground. As a result of the fall, Washnock sustained a crippling injury that lacerated her leg to the bone. The following morning, on December 1, after being found face down and unresponsive approximately 25 feet from a rear service door, Washnock was declared dead. According to the autopsy report, overnight temperatures on November 30 were as low as 28 degrees Fahrenheit, supporting the official finding that Washnock died from

---

[1]It should be noted that the "Resident Agreement" provided Brookdale with the right to remove Washnock upon a finding that she was unable to live safely in the facility. (Pltf's Resp at Ex. 6).

[2] Brookdale does not appear to refute these allegations.

hypothermia. (Ex. 2 at 6, Pl's Resp.)

II.

The purpose of the summary judgment rule, as reflected by Federal Rule of Civil Procedure 56, "is to isolate and dispose of factually unsupportable claims or defenses . . . ." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). Thus, the entry of a summary judgment is proper only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is 'material' for purposes of summary judgment if proof of that fact would have the effect of establishing or refuting an essential element of the cause of action or a defense advanced by the parties." *Aqua Grp., LLC v. Fed. Ins. Co.*, 620 F. Supp. 2d 816, 819 (E.D. Mich. 2009) (citing *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984)). In order for a dispute to be genuine, it must contain evidence upon which a trier of the facts could find in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Singfield v. Akron Metro. Hous. Auth.*, 389 F.3d 555, 560 (6th Cir. 2004). When assessing a motion for the entry of a summary judgment, a court "must view the facts and all inferences to be drawn therefrom in the light most favorable to the non-moving party." *60 Ivy Street Corp. v. Alexander*, 822 F.2d 1432, 1435 (6th Cir. 1987). The entry of a summary judgment is appropriate only if the nonmoving party fails to present evidence which is "sufficient to establish the existence of an element essential to its case, and on which it will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

Thus, the moving party has the initial obligation of identifying those portions of the record that will demonstrate the absence of any genuine issue of a material fact. *Celotex*, 477 U.S. at 323. Thereafter, the nonmoving party has the burden to "come forward with some probative evidence

to support its claim and make it necessary to resolve the differences at trial." *Boyd v. Ford Motor Co.*, 948 F.2d 283, 285 (6th Cir. 1991); *see also Anderson*, 477 U.S. at 256. The presence or the absence of a genuinely disputed material fact must be established by (1) a specific reference to "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials," or (2) a "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).

III.

Washnock has asserted her claim of negligence against Brookdale on the basis of a theory that "Grand Court failed to appropriately monitor the exterior doors so as to prevent an elderly, confused resident from being locked out of the building." (Pl's Resp. at 8). Because federal jurisdiction in this case is based on diversity of citizenship, the Court will apply the substantive law of Michigan. *See Erie R.R. Co. v. Tompkins,* 304 U.S. 64, 78 (1938).

Under Michigan law, a plaintiff must prove the following elements to establish a prima facie case of negligence; namely, that "(1) the defendant owed the plaintiff a legal duty, (2) the defendant breached the legal duty, (3) the plaintiff suffered damages, and (4) the defendant's breach was a proximate cause of the plaintiff's damages." *Loweke v. Ann Arbor Ceiling & Partition Co., L.L.C.*, 809 N.W.2d 553, 556 (Mich. 2011). Brookdale's motion for the entry of a summary judgment focuses exclusively on the "duty" prong of Michigan's negligence test, arguing that it did not owe a duty to anyone to monitor or supervise its residents. Moreover, Brookdale also rejects the concept, as advanced by the Plaintiff, that it had a legal obligation to monitor the exits of its facility by

installing alarms or cameras.[3] Both parties appear to agree that there is a lack of precedent which squarely addresses the legal question of duty, if any, in the context of independent senior living facilities.

Michigan courts have historically recognized that a "[d]uty may be established 'specifically by mandate of statute, or it may arise generally by operation of law under application of the basic rule of the common law . . . .'" *Riddle v. McLouth Steel Products Corp.*, 485 N.W.2d 676, 681 (Mich. 1992). Generally, the law may recognize a tort duty where "the relationship between the actor and the injured person gives rise to [a] legal obligation on the actor's part for the benefit of the injured person." *Moning v. Alfono*, 254 N.W.2d 759, 765 (Mich. 1977). In seeking to determine whether there is a legal obligation on the part of the actor that the law will recognize, the question of duty will often be based on a number of different factors, including (1) foreseeability of the harm, (2) degree of certainty of injury, (3) closeness of connection between the conduct and injury, (4) moral blame attached to the conduct, (5) policy of preventing future harm, and (6) the burdens and consequences of imposing a duty and the resulting liability for breach. *Valcaniant v. Detroit Edison Co.*, 679 N.W.2d 689, 691 (Mich. 2004) (citations omitted). The nature of the parties' relationship is critical in determining the existence, if any, of a legal obligation because it is a basic principle of negligence law that - as a general rule - "there is no duty that obligates one person to aid or protect another." *Williams v. Cunningham Drug Stores, Inc.*, 418 N.W.2d 381, 383 (Mich. 1988), citing 2 Restatement Torts, 2d, § 314, p. 116.[4]

---

[3] The Court decides the questions of duty and the general standard of care. *See Williams v. Cunningham Drug Stores, Inc*., 418 N.W.2d 381, 383 (Mich. 1988).

[4] The Court notes that while *Williams* involved the duty of care that a merchant owes his customers, the Michigan Supreme Court has since extended its reasoning to the landlord-tenant

While the common law has been reluctant to impose an affirmative duty upon one actor to protect another, the *Williams* court noted that this duty to protect has been applied in the past to (1) a common carrier and its passengers, (2) an innkeeper and its guests, and (3) an employer and its employees, explaining that

> [t]he rationale behind imposing a duty to protect in these special relationships is based on control. In each situation one person entrusts himself to the control and protection of another, with a consequent loss of control to protect himself. The duty to protect is imposed upon the person in control because he is best able to provide a place of safety. *Williams*, 418 N.W.2d at 383.

Of particular relevance here, the Michigan courts have specifically found that owners and occupiers of land are in a special relationship with their invitees and comprise the largest group upon whom an affirmative duty to protect is imposed. *Id.* Indeed, "a landlord may be held liable for an unreasonable risk of harm caused by a dangerous condition in the areas of common use retained in his control such as lobbies, hallways, stairways and elevators." *Id.* This duty is not absolute, however, because "the [landowner] [or] occupier is not an insurer of the safety of invitees, and his duty is only to exercise reasonable care for their protection." *Id.* The scope of the duty owed, if any, is necessarily a subjective inquiry and requires a close look at both the allegedly unreasonable condition and the specific circumstances surrounding the relationship between the landlord and the tenant.

The thrust of the Defendant's counter-argument is essentially that inasmuch as Grand Court was an independent living facility, as opposed to an adult foster care provider, the injuries sustained by its residents in the course of exercising their independence cannot be the foundation for a

---

relationship. *See Bailey v. Schaaf*, 835 N.W.2d 413, 425 (Mich. 2013).

negligence claim. In support of this argument, Brookdale relies heavily upon a decision out of the Ohio Court of Appeals, *Corsaro v. ARC Westlake Villa*ge, *Inc.*, 2005 Ohio 1982, 2005 WL 984502 (Ohio Ct. App. 2005). In *Corsaro,* the decedent was a resident of an independent living facility. In light of the decedent's mental state, her family contracted with the facility for an additional fee to escort her to and from the dining room each night. *Id.* at *1. Following dinner one evening, the decedent indicated to facility staff that she did not require an escort on this particular occasion. *Id.* During the walk back to her apartment, the decedent fell and fractured her wrist. *Id.* Her family subsequently brought suit against the facility alleging negligence based upon a *contractual* duty to supervise. *Id.* at *2. A directed verdict was granted in favor of the facility.

On appeal, the lower court's decision was affirmed because "the [decedent's] decision to continue unescorted to her apartment relieved Westlake Village of any obligation [under its contract] to escort her to her apartment." *Id.* at *3. Moreover, even assuming, *arguendo,* that the decedent had not affirmatively negated the defendant's contractual duty, there was a glaring causation issue; namely, the plaintiff acknowledged that (1) the duty undertaken was *not* to physically help the decedent walk, but rather to provide directions to and from her room to the dining hall, and (2) the sole duty to the decedent was based in contract (thus disclaiming any potential tort remedy). *Id*. at *4. In other words, the decedent's injury was not the direct and proximate result of the facility's failure to carry out its contractual duty. *Id.*

It is worth noting the obvious; namely, that *Corsaro* is not binding upon this Court. Moreover, it is both factually and procedurally distinguishable from the case at bar for a number of reasons. First, the Plaintiff submits that Brookdale had both a contractual and a tort duty to supervise its residents. In support of its contractual duty theory, the Plaintiff asks the Court to

examine the various agreements in which Brookdale allegedly assumed responsibility for the health and safety of its residents. (Pl's Resp. at 17). Although the "Resident Agreement" does grant Brookdale the right to enter an apartment unit, it does not require the facility to undertake a supervisory role with regard to the general well-being of the residents. Furthermore, the record is clear that Washnock contracted with an outside agency- (namely, ComForcare Senior Services) to provide daily supervision and support within the confines of her apartment. As such, the Court concludes that Brookdale did not have any contractual duty to supervise Washnock during the times that are relevant to this inquiry.

Putting the issue of the parties' contractual duty aside, the next question becomes whether Brookdale had an affirmative obligation to protect Washnock from harm. According to Brookdale, notwithstanding the fact that (1) the average age of a resident in the Grant Court facility was 86 years (Faff Dep. 50:21 Ex. 4 to Pl's Resp.), (2) a substantial number of the residents had some degree of cognitive impairments, (*Id.* at 44:13-18), and (3) the outside temperature on the night in question was somewhere around 28 degrees Fahrenheit, there was nothing inherently dangerous about an unmonitored self-locking door in the common area of the facility. A review of those factors in *Valcaniant* which support the imposition of a legal duty under the common law dictates otherwise.[5]

Starting with the "foreseeability of the harm" and "degree of certainty of injury" factors, the Defendant does not challenge the Plaintiff's contention that the door in question was neither monitored nor equipped with a buzzer system which would alert the facility staff that someone was

[5] The Court notes that Brookdale fails to discuss *any* of the *Valcaniant* factors in its motion for summary judgment.

locked out. Furthermore, the record in this case indicates that the door was located in a common hallway and was not accessible from the outside without an electronic keycard; issued only to those residents with a vehicle on the premises. Under these circumstances, all residents without a vehicle had no means of reentering the facility through the door that Washnock exited. As such, it was certainly foreseeable that (1) in a community catering to elderly individuals primarily over the age of 85, many of whom were suffering from cognitive impairment, that a resident could inadvertently wander out an exit door located in a common area, (2) where, as here temperatures were below freezing, a resident would not have the ability to renter the building prior to being susceptible to incurring an injury, and (3) that without access to the building for a prolonged period of time, hypothermia or serious injury was a substantially likely result. In summary, these factors support the imposition of a legal duty.

The third factor considers the closeness of connection between the conduct and the injury. Here, the question is what impact, if any, Brookdale's decision to leave the door unmonitored had on Washnock's ultimate demise. The record suggests that Washnock attempted to regain access to the facility through a patio door located in the back of the building. *See* (Plf's Resp. Ex. 9 at 3-4). It seems reasonable to suggest, therefore, that if the door Washnock used to leave the facility was equipped with a bell or buzzer, she likely would have attempted to alert the attention of someone on the inside. Moreover, a member of Brookdale's own staff indicated that, under the circumstances of Washnock's departure, someone at the facility would have intervened if the incident had been observed at any earlier time. *See* (Faff Dep. 41:7-15 Ex. 4 to Pl's Resp.). Both of these facts tend to suggest that Brookdale's failure to take proactive measures played a significant role in the unfortunate circumstances prompting this litigation.

The fourth and fifth factors - moral blame attached to the conduct and the policy of preventing future harm - both concern the broader policy implications of imposing a legal duty in the context of assisted or "independent" senior living facilities. While the thrust of this question remains, up until this point, unanswered, at least one court has endeavored to explain the importance of recognizing the very purpose of these institutions:

> There is . . . a fundamental distinction about the residents in assisted living facilities that is not true of those in traditional landlord/tenant relationships. Unlike people who choose to live in single family homes, the residents of this assisted living facility have their home there because they must. They have been forced by the afflictions of age, by deteriorating cognitive and mental acuity as well as physical decline, to give up their conventional home . . . In short they have turned to assisted living facilities not in the same way that the general public chooses ordinary homes . . . but instead for protection from the ordinary risks of everyday life associated with the steady decline in their own abilities to look after themselves. What plaintiff appears to claim is that this facility failed to exercise due care in the single thing-the sole function-that made him seek out such a facility.
>
> *Selvin v. DMC Regency Residence, Ltd.*, 807 So. 2d 676, 681 (Fla. Dist. Ct. App. 2001),

The Court finds the discussion in *Selvin* to be equally applicable in the context of independent living facilities such as Grand Court, which, for all practical purposes, appear to serve the same core constituency; namely, elderly individuals seeking "protection from the ordinary risks of everyday life." *Id.* Businesses that deliberately market and cater to a specific group of "at risk" individuals carry a significantly higher degree of moral blame when they fail to provide the most basic of protections to the persons whom they serve. Indeed, Brookdale has no qualms about demanding a substantial premium from those elderly individuals who have expressed a desire to live in their "independent" communities, but argues that the law should treat their facility no differently from the landlord of a single-family home.

Finally, the last factor considers the burdens and consequences of imposing a duty and the resulting liability for its breach. Simply put, the burden associated with preventing individuals from being locked out of the facility appears to be infinitesimally small when compared with the severity of the potential consequences. Indeed, the burden here can be satisfied by merely installing a sensor, an operative doorbell/buzzer system, or a video camera at the periphery of the exterior doors. The consequence of imposing this duty would be to lessen the chance that an elderly and cognitively impaired individual would wander away from the facility unobserved.

Upon a review of the *Valcaniant* factors, the Court concludes that Brookdale had a legal duty to monitor the self-locking exit doors in the common areas of its senior living facility to prevent a resident such as Washnock from leaving alone and without notice to staff. However, "because [Michigan's] common law has consistently imposed a duty *only* where a landlord or merchant exercises control over particular premises, a landlord's duty arises *only* when the triggering conduct occurs in those areas under the landlord's control." *Bailey v. Schaaf*, 835 N.W.2d 413, 425 (Mich. 2013) (emphasis added).

The Court likewise finds the Defendant's "open and obvious" argument to be unavailing. Accoding to the law of Michigan, if the condition of the premises is "so obvious that the invitee might reasonably be expected to discover [it], an invitor owes no duty to protect or warn the invitee unless he should anticipate the harm despite knowledge of it on behalf of the invitee." *Lugo v. Ameritech Corp., Inc.*,629 N.W.2d 384, 386 (Mich. 2001) (citations omitted). The test to be employed is an objective one. It asks whether "an average user with ordinary intelligence would have been able to discover the danger and risk presented upon casual inspection[.]" *Novotney v. Burger King Corp.*, 499 N.W.2d 379, 381 (Mich. Ct. App. 1993). However, "if special aspects of

a condition make even an open and obvious risk unreasonably dangerous, the premises possessor has a duty to undertake reasonable precautions to protect invitees from that risk." *Lugo*, 629 N.W. 2d at 386.

Here, the Defendant argues that "[t]here was no reason for the landlord in this case to forsee that a resident would not appreciate the risk of being locked out of the building." (Def. Mot. for Summ J. at 8.). The inquiry, however, is not whether the invitee can appreciate a generalized risk, but rather the harm associated with a particular danger present on the property. Thus, the question is whether someone of ordinary intelligence would have discovered that the door from which Washnock exited was self-locking and unmonitored. A casual inspection of the interior of the door would not lead an average user to this conclusion for several reasons. First, there was no signage that would alert a user that the door was self-locking or unmonitored. In fact, an employee at the Grand Court facility testified that, at one point in time, "cameras were mounted next to the door . . ." *See* (Schlief Dep. 58:14-15, Ex. 5 to Pl's Resp.). Finally, while the average user would expect there to be a doorbell or buzzer on the outside of a door located near one of the primary exits of a senior housing complex, there was nothing to suggest the absence of this feature here. As such, all of these facts tend to suggest that the danger was neither open nor obvious.

As for the last order of business, the Plaintiff seeks leave to amend her witness list to add Kathleen Hill-O'Neil as an expert to offer testimony on the unpredictability of geriatric patients. (Plf's Mot. for Leave, ECF No. 45). Pursuant to Fed. R. Civ. P. 16(b), a scheduling order establishing deadlines for matters such as amendments to pleadings "shall not be modified except upon a showing of good cause and by leave of the district judge." "The primary measure of Rule 16's 'good cause' standard is the moving party's diligence in attempting to meet the case management

order's requirements." *Inge v. Rock Fin. Corp.*, 281 F.3d 613, 625 (6th Cir. 2002) (internal citations omitted). Brookdale argues that the Plaintiff has not offered any explanation as to why this proposed expert or her testimony could not have been disclosed within the time frame established by the Scheduling Order governing this matter. In response, the Plaintiff contends that she could not have anticipated the need for Ms. Hill-O'Neil's line of testimony until *after* Brookdale filed its motion for summary judgment. Finding nothing novel about Brookdale's theory of defense in this case, the Court is not persuaded by the Plaintiff's justification for the production of this proposed expert witness. Therefore, the Court will deny the Plaintiff's request to add Ms. Hill-O'Neil as an additional witness.

IV.

For the reasons thus stated, the Court (1) denies the Defendant's motion for summary judgment (ECF No. 21), (2) grants the Plaintiff's motion to supplement her response (ECF No. 42), and (3) denies the Plaintiff's motion to file an amended witness list (ECF No. 45).

IT IS SO ORDERED.

Date: February 6, 2014

s/Julian Abele Cook, Jr.
JULIAN ABELE COOK, JR.
U.S. District Judge

CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing Order was served upon counsel of record via the Court's ECF System to their respective email addresses or First Class U.S. mail to the non-ECF participants on February 6, 2014.

s/ Kay Doaks
Case Manager